UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **LEROY SEXTON** | |
| | **CIVIL ACTION** |
| **VERSUS** | |
| | **NO.: 17- 482-JWD-RLB** |
| **EXXON MOBIL CORPORATION, ET AL** | |

### RULING ON DEFENDANT FLOWSERVE US INC.'S *DAUBERT* MOTION AND/OR MOTION IN LIMINE TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT, MICHAEL EDWARD SAWYER

Before the Court is the *Daubert* Motion and/or Motion in Limine to Exclude Testimony of Plaintiff's Expert, Michael Edward Sawyer (Doc. 238) brought by defendant Flowserve US Inc. ("Defendant" or "Flowserve"). It is opposed by plaintiff Leroy Sexton ("Plaintiff" or "Sexton"). (Doc. 258.) Flowserve filed a reply brief. (Doc. 275.) The Court has carefully reviewed the motion and associated memoranda, and, for the following reasons, the motion is denied.

**I.   BACKGROUND**

The case arises out of a fire and explosion which occurred at the Exxon Mobil Corporation refinery in Baton Rouge, Louisiana on November 22, 2016. Plaintiff was among those injured and sues Flowserve as the manufacturer of a plug valve[1] involved in the explosion. Sexton was one of four individuals injured. An L-shaped bracket (also manufactured by Flowserve) was used to mount an actuator/gearbox on top of the plug, along with a handwheel

---

[1] The valve in question was a series G411 plug valve manufactured by Flowserve's predecessor, The Duriron Company, Inc. (Doc. 238 at 1.)

1

used to manually operate the actuator/gearbox. (*Id*. at 2-3.) The plug valve was located in an active pressurized isobutane line. (*Id*. at 3.)

An Exxon worker, Jonathan Zachary ("Zachary"), attempted to open the valve by using the handwheel which was inoperable. (*Id*. at 1-2.) While the isobutane line was still under pressure, Zachary then began to remove the actuator gearbox in order to gain access to the valve stem which he intended to then open with a wrench. (*Id*. at 2.) Four vertical screws secured the L-shaped bracket to the plug but also secured the pressure plate on the plug valve. (*Id*.)

As described in Flowserve's motion,

> After removing the actuator/gearbox, Zachary used a wrench to turn the now exposed valve stem. Upon doing so, because Zachary had removed the four vertical bolts securing the pressure plate while the isobutane line was still pressurized, pressurized isobutane entered the plug valve causing the plug to be partially and or totally ejected at which point the pressurized isobutane was released into the atmosphere. The isobutane reached an ignition source . . . and a fire and explosion occurred injuring plaintiff.

(*Id*. at 2-3.)  As described in Plaintiff's opposition,

> Unbeknownst to Zachary, the four bolts that connected the bracket to the valve were also pressure-containing bolts that held the top cap of the valve in place. Although removing the bottom four bolts could result in catastrophic valve failure, with the plug being ejected by the pressure, resulting in the release of whatever potentially toxic or flammable liquid was in the line, there was no warning or instruction on the valve or the actuator to alert Zachary of that danger. Of the 500 block valves with gearboxes in the Alky unit where Zachary worked, only about 3% had this particular design characteristic. On the other 97%, there were no "wrong bolts" associated with the actuator that, if removed, could result in a catastrophic explosion.

(Doc. 258 at 1-2.)

According to Flowserve, Plaintiff sues Flowserve under the Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51 *et seq*., alleging that Flow Serve's product was 1) unreasonably dangerous in construction or composition; 2) unreasonably dangerous in design and 3) unreasonably dangerous due to inadequate warnings. (Doc. 238 at 3). According to Plaintiff, he is asserting claims against Flowserve for design defect and lack

of an adequate warning under subsections (2) and (3). (Doc. 258 at 4.) Despite Flowserve's assertion, he does not mention a claim based on defective construction or composition. (*Id*.)

## II.     MICHAEL EDWARD SAWYER

The subject of Flowserve's motion is Michael Edward Sawyer ("Sawyer"). Sawyer's Curriculum Vitae is attached to Plaintiff's opposition brief. (Doc. 258-1 at 46-60.) Briefly, Sawyer earned a Bachelor of Science degree in Safety Engineering from Texas A&M University in 1983. He is a Registered Professional Engineer in Texas and Massachusetts and a Certified Safety Professional. According to his CV, he has "led and participated on various safety engineering projects over the past 36 years. These have ranged from general industrial safety applications to detailed analyses of process units and systems. . . .  The greatest span of Mr. Sawyer's career has been in the area of process safety [and] has facilitated numerous hazard and risk assessments studies of petrochemical facilities throughout the world." (Doc. 258-1 at 48.) He has also "participated in numerous fire and explosion investigations at refineries, and facilities handling highly hazardous chemicals…" (Doc. 258-1 at 3.)

Sawyer's report is attached to Flowserve's motion at Doc. 238-2 at 154–173; it is also attached to Plaintiff's opposition at Doc 258-1 at 1–20. The documents he reviewed in preparation for giving his opinions are found at Doc. 258-1 at 21–45. His prior depositions and trial testimony for the preceding four years can be found at Doc. 258-1 at 59 and his fee schedule is in the same document, *id.* at 60. Flowserve attaches his deposition at Doc. 238-2 at 1–153. His affidavit is attached at Doc. 258-2.[2]

---

[2] Sawyer's affidavit is the subject of a separate motion to strike. (Doc. 279.) Because the Court has not yet ruled on the motion to strike, the Court has not considered the affidavit for purposes of its ruling on this motion.

### III. ARGUMENTS OF THE PARTIES

#### A. Flowserve's Arguments

Flowserve's main argument, that Sawyer's opinions are irrelevant, is premised on its contention that, under the LPLA, "whether a product is 'unreasonably dangerous', is determined ***at the time the product left the manufacturer's control***, which in this case, was the [sic] in the 1970s." (Doc. 238-1 at 8 (emphasis in original).) Flowserve further contends that "the totality of Sawyer's opinions [regarding] plaintiff's claims against Flowserve are contained in a single paragraph," [paragraph 5.4 found at Doc. p. 19 of his report], which states:

> Flowserve's omissions, and failures were contributing factors to the existing circumstances at the Baton Rouge [sic]. As admitted by Flowserve's Corporate Representative, notifying their end users about safety was a duty of Flowserve. While Flowserve purports to have notified ExxonMobil about the safer design, it failed to produce evidence of that communication with the Baton Rouge Refinery pertaining to the plug valve design hazard identified in memorandums to its valve distributors such as Setpoint.

(Doc. 238-1 at 3–4.)

Because this alleged failure on the part of Flowserve occurred after the valve left the control of Flowserve's predecessor, "no relevant inquiry exists under the specific LPLA claims asserted by plaintiff . . . regarding the conduct of Flowserve after the Flowserve plug valve left Flowserve's control in the 1970s." (*Id*. at 9.) "In short, Mr. Sawyer is simply attempting to opine on a theory of liability that does not exist under the LPLA – i.e. that, after the Flowserve plug valve . . . left its control, Flowserve's [sic] changed its design for mounting actuators/gearboxes and that Flowserve (1) had a duty to notify Exxon of its new design, and (2) failed to do so. No such theory of liability can be found in the LPLA." (*Id*. at 10)

4

La. R.S. 9:2800.57(C), imposes a duty to use reasonable care to provide an adequate warning of a characteristic of the product that may cause damage and the danger of such characteristic to users and handlers of the product, about which it has become aware after the product has left its control. Flowserve contends that "[a]s a matter of law, [it] has no application in this case." (*Id*. at 9.) Why? "In this case, Flowserve was already aware of the purportedly dangerous characteristic that may cause damage alleged to exist in the Flowserve plug valve and Flowserve contends that it used reasonable care to provide an adequate warning, which is the scenario contemplated in 9:2800[.57](A)." (*Id*.)[3]

Further, argues Flowserve, even if 2800.57(C) did apply, Sawyer does not opine that Flowserve became aware of a dangerous characteristic of the product after it left Flowserve's control or failed to provide an adequate warning concerning same, but only that Flowserve changed the design and failed to alert Exxon/Mobil "about its new (allegedly 'safer') design." (*Id*. at 9-10.)

Flowserve's second reason proffered to exclude Sawyer's opinions is that the alleged changes to the product upon which he bases his opinions are inadmissible subsequent remedial measures under Federal Rule of Civil Procedure 407. (*Id*. at 10–11 (citing no case law in support of this contention).) Third, Flowserve argues that his opinions are "admittedly not opinions for which any scientific, technical, or other specialized training are required to help the trier of fact in this case understand the evidence or determine a fact in issue as required by Rule 702 of the Federal Rules of Evidence. (*Id*. at 11–12 (citing Sawyer's deposition, Doc. 238-2 at 7–10, 14).) Finally, Sawyer is "admittedly not qualified . . . to provide any opinions in this case regarding

---

[3] Flowserve points to no record evidence to support this contention/concession.

5

any of plaintiff's claims against Flowserve under the LPLA." (*Id*. at 12 (citing Sawyer's deposition, Doc. 238-2 at 36–37).)

### B. Plaintiff's Arguments

In his opposition, Plaintiff disagrees with Flowserve's limited characterization of Sawyer's report (Doc. 258 at 5 (citing to specific pages of the report, Doc. 258-1).) Plaintiff vehemently disputes Flowserve's assertion that Sawyer's opinions regarding Flowserve are limited to a single paragraph. (*Id*. at 6.) Instead, the report sets out the facts and analyzes the factors leading up to the accident; it describes the plug valve support bracket involved in the accident and compares it to others at the Exxon plant. It "details the risks associated with design of Flowserve's Durco plug valve, including historical incidents where the use of that same configuration led to multiple deaths and serious injuries." (*Id*. at 5.) It explains the "well documented risk associated with the . . . plug valve . . ." and also "includes documentation showing Flowserve's actual knowledge of the hazards of the design by the 1980s, as well as Flowserve's decision to switch to the inherently safer flange mounted design in the early 1980s." (*Id*. at 5–6.) Finally, Sawyer "explains why the Flowserve top cap mounted design is inherently and unnecessarily dangerous and how the design led to the refinery fire that injured Plaintiff and others." (*Id*. at 6.)

Plaintiff takes issue with Flowserve's premise that all matters occurring after the plug valve left Flowserve's predecessor are irrelevant. (*Id.* at 10 (citing *Krummel v. Bombardier Corp*., 206 F.3d 548 (5th Cir. 2000).) Plaintiff states that the jury must make a risk-utility analysis, first determining what risk the product created and then determine whether a reasonable

6

person would conclude that the danger outweighs the utility of the product. (*Id.*) Flowserve's later awareness of the danger of its design is relevant to that analysis.

Plaintiff accuses Flowserve of "re-defin[ing]" and mischaracterizing Plaintiff's allegations regarding the danger of the product and, by doing so, Flowserve mistakenly argues that it was already aware of the danger at the time the product left its control. (*Id*. at 11.) Contrary to what Flowserve suggests, the dangerous characteristic alleged by Plaintiff "is the fact that using the same pressure-containing bolts to attach the actuator to the valve as the ones used to hold the top cap in place creates a risk that workers seeking to access the valve stem will inadvertently remove the wrong bolts, potentially resulting in serious injury or death." (*Id*. at 11.)

Plaintiff insists that there is evidence that Flowserve never gave a warning about that danger. Plaintiff further insists that:

> Flowserve has not admitted that it was aware at the time the valve left its control of the risk that users would not recognize that the bolts secured the bracket to the valve were pressure-containing, and that removing them while the valve was in service presented a serious risk of injury or death. . . .  Consequently, everything showing Flowserve's awareness of the dangerous characteristic [of the] product . . .after the valve left its control is relevant to the warnings claim.

(*Id*. at 11-12.)

Plaintiff calls Defendant's Rule 407 subsequent remedial measure argument "frivolous" since, in order to qualify, the remedial measures must have been taken after the event causing injury, i.e. the injury itself. (*Id*. at 12 (citing Fed. R. Evid. 407, Notes of Advisory Committee on 1997 amendments; *Roberts v. Harnischfeger Corp*., 901 F.2d 42, 44, n.1 (5th Cir. 1989); and *Arceneaux v. Texaco, Inc*., 623 F.2d 924, 928 (5th Cir. 1980).) Here, all parties agree that the so-called subsequent remedial measures occurred before Plaintiff's accident and injury.

Plaintiff responds to Flowserve's next ground for exclusion, i.e. that it would not assist the trier of fact, by pointing to the lengthy and detailed report itself which included highly

7

technical information about the facts surrounding the accident, its causes and the role played by Flowserve's valve. (*Id*. at 13.) He also points to Sawyer's affidavit in which he criticizes and explains the mischaracterization of his opinions as portrayed in Flowserve's brief. (*Id*. at 14–15.) Plaintiff counters Flowserve's last ground, Sawyer's alleged lack of qualifications to offer his opinions by pointing to his qualifications as set out in his CV and by emphasizing that his training, education and experience qualify Sawyer for the opinions he gave. (*Id*. at 15–16.)

### C. Flowserve's Reply

In its Reply, Flowserve argues that Sawyer is a "process safety engineer" and has "proceeded into areas of expertise (far outside 'process safety') in which he admits he is not qualified." (Doc. 275 at 2.) He admitted that he is not qualified to opine regarding whether the valve was defectively designed. Furthermore, he admitted his report does not opine on the adequacy of the warnings associated with the plug valve. (*Id*. at 4 (citing Doc. 238-2 at 36).) Despite Plaintiff's assertions to the contrary, Sawyer admitted in his deposition that his opinions regarding Flowserve are limited to paragraph 5.4 of his report. (*Id*. at 3 (citing Doc. 238-2 at 57).)

As to the risk-utility analysis referred to by Plaintiff in his opposition, Sawyer did not perform such an analysis nor is he qualified to render an opinion on same. (*Id*. at 5–6, 7–8.) Flowserve reiterates that the only relevant information regarding warnings flowing from 9:2800.57 (A) or (C) is the warnings which were present (or should have been) at the time the valve left the manufacturer's control in the 1970s, and his opinion is silent as to same. (*Id*. at 8-10.) Flowserve's reply is silent on the issue of subsequent remedial measure, but it repeats its charge that Sawyer's opinions will not assist the trier of fact. (*Id*. at 10.)

### IV. STANDARD

Flowserve's motion is a *Daubert* challenge. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). When *Daubert* is invoked, a district court may, but is not required to, hold a hearing at which the proffered opinion may be challenged. *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016). However, when no hearing is held, "a district court must still perform its gatekeeping function by performing some type of *Daubert* inquiry." *Id.* "At a minimum, a district court must create a record of its *Daubert* inquiry and 'articulate its basis for admitting expert testimony.'" *Id.* (quoting *Rodriguez v. Riddell Sports, Inc.,* 242 F.3d 567, 581 (5th Cir. 2001)).

Pursuant to Federal Rule of Evidence 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the rule's preconditions are met. The role of the trial court is to serve as the gatekeeper for expert testimony by making the determination of whether the expert opinion is sufficiently reliable. As the Fifth Circuit has held:

> [W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case. *Daubert* went on to make "general observations" intended to guide a district court's evaluation of scientific evidence. The nonexclusive list includes "whether [a theory or technique] can be (and has been) tested," whether it "has been subjected to peer review and publication," the "known or potential rate of error," and the "existence and maintenance of standards controlling the technique's operation," as well as "general acceptance." The [Supreme] Court summarized:
>
> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) (internal citations omitted).

Cases following *Daubert* have expanded upon these factors and explained that *Daubert*'s listing is neither all-encompassing nor is every factor required in every case. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Indeed, courts may look to other factors. *Joiner*, 522 U.S. at 146.

As this Court has explained:

> The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which provide that the court serves as a gatekeeper, ensuring all scientific testimony is relevant and reliable. This gatekeeping role extends to all expert testimony, whether scientific or not. Under Rule 702, the court must consider three primary requirements in determining the admissibility of expert testimony: 1) qualifications of the expert witness; 2) relevance of the testimony; and 3) reliability of the principles and methodology upon which the testimony is based.

*Fayard v. Tire Kingdom, Inc.*, No. 09-171, 2010 WL 3999011, at *1 (M.D. La. Oct. 12, 2010) (internal citations omitted) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)).

This Court has broad discretion in deciding whether to admit expert opinion testimony. *See, e.g.*, *Joiner*, 522 U.S. at 139 (appellate courts review a trial court's decision to admit or exclude expert testimony under *Daubert* under the abuse of discretion standard); *Watkins*, 121 F.3d at 988 ("District courts enjoy wide latitude in determining the admissibility of expert testimony."); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence.").

"Notwithstanding *Daubert*, the Court remains cognizant that 'the rejection of expert testimony is the exception and not the rule.'" *Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (citing Fed. R. Evid. 702 Advisory Committee Note (2000 amend.)). Further, as explained in *Scordill v. Louisville Ladder Grp., L.L.C.*:

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'"

No. 02-2565, 2003 WL 22427981, at *3 (E.D. La. Oct. 24, 2003) (Vance, J.) (internal citations omitted) (relying on, among others, *Rock v. Arkansas*, 483 U.S. 44, 61 (1987), and *United States v. 14.38 Acres of Land, More or Less Sit. In Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

The Supreme Court has recognized that not all expert opinion testimony can be measured by the same exact standard. Rather, the *Daubert* analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 150, *cited with approval in Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 244 (5th Cir. 2002).

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *14.38 Acres of Land More Or Less Situated in Lefore County, Miss.*, 80 F.3d at 1077 (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see also Imperial Trading Co. v. Travelers Property Cas. Co. of America*, No. 06-4262, 2009 WL 2356292, at *3 (E.D. La. July 28, 2009). Furthermore, "[m]atters left for the jury's consideration include the alleged miscalculations, erroneous assumptions, and inconsistencies that plaintiffs

11

object to." *Imperial Trading*, 2009 WL 2356292, at *3 (citing *Southwire Co. v. J.P. Morgan Chase & Co.*, 258 F. Supp.2d 908, 935 (W.D. Wis. 2007)).

V.  **DISCUSSION**

   A. **Relevance**

Underlying Flowserve's motion is the premise that if Sawyer's opinion does not directly address Flowserve's fault, it is not relevant to issues in the case. This is a false premise. The Court has carefully reviewed Sawyer's report and concludes that, even without regard to paragraph 5.4, much of the report bears on items relevant to the jury's determination of Plaintiff's claim against Flowserve and also the relative fault of former defendants who have now settled with Plaintiff. *See* La. Civil Code Art. 2323. Sawyer's report provides relevant data and opinions on such things as the background and purpose of plug valves in the context of a refinery like ExxonMobil's; a comparison of the various configurations of plug valves and support brackets for their actuators, gear boxes and handwheels; risks associated with the configuration of the Flowserve valve and bracket including prior incidents involving this configuration; industry and governmental knowledge of these risks and the causes of the accident. All of these items are highly relevant.

Despite Flowserve's repeated assertions to the contrary, Sawyer's comments regarding Flowserve's involvement in the accident are not limited to paragraph 5.4. Particularly relevant to Flowserve's potential liability is Flowserve's recognition of the problems, dangers and risks associated with the design and configuration in question as set out in paragraphs 4.26 – 4.30. Paragraph 4.26 states:

> 4.26.   During 1982, The Duriron Company (Flowserve) stopped offering top cap mounting for the valves they manufactured. In 1985 Duriron (Flowserve) formally acknowledged in a letter to its valve distributors, ***"mounting of valve actuators using***

12

> *the top cap closure bolts may be a serious safety hazard if customer maintenance personnel fail to follow proper maintenance instructions and procedures."*

(Doc. 258-1 at 14.)

It is also clear that, despite the language used by Sawyer in paragraph 5.4, Sawyer has not limited his opinion regarding Flowserve's involvement to failing to notify ExxonMobil about a "safer design" but, as stated paragraph 4.26, his opinion includes Flowserve's 1985 knowledge and acknowledgement of the "serious safety hazard" created by the configuration and design of the valve. (*Id*.) Paragraph 4.27 suggests that Flowserve was aware in 1986 that mechanics had removed bolts on pressure containing components. (*Id*.) Paragraph 4.30 states that Flowserve had in fact warned Exxon "about the particular valve design hazard" but no documentation was produced by Flowserve to confirm this. (*Id*. at 15.)

In its Reply, Flowserve makes much of the its assertion that "Mr. Sawyer was undoubtedly retained by plaintiff in this case as a 'process safety expert' to opine about the alleged 'intentional tort' conduct of Exxon that caused [the] November 22, 2016 catastrophic incident…," suggesting these paragraphs of his report are irrelevant. (Doc. 275 at 2 (citing to 15 paragraphs of Sawyer's report that it argues address Exxon's conduct).) Despite the fact that Exxon has settled with Plaintiff and is no longer a party in the case (Docs. 252–253), Exxon's fault remains an issue in the case, La. Civil Code Art. 2323 states, in pertinent part: "In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death or loss shall be determined, regardless of whether the person is a party…" *Kenner Plumbing Supply, Inc. v. Rusich Detailing, Inc.,* 14-922 (La. App. 5 Cir. 9/23/15), 175 So.3d 479, 500. Indeed, it would be surprising if Flowserve did not, at least in the alternative, allege and attempt to prove at trial the fault of settling

13

defendants and perhaps others. Should that happen, it may well attempt to utilize some of Sawyer's opinions for its own purposes.

Flowserve insists that Sawyer's opinions and the evidence upon which they are based are irrelevant because these events occurred after the original manufacture of the product. First, it is clear that this objection, even if valid, would not exclude certain parts of his opinions/testimony as, for instance, with the background and purpose of plug valves in the context of a refinery like ExxonMobil's; a comparison of the various configurations of plug valves and support brackets for their actuators, gear box and handwheel; risks associated with the configuration of the Flowserve valve and bracket including prior incidents involving this configuration; industry and governmental knowledge of these risks and the cause of the accident.

In addition, however, part of Plaintiff's claim against Flowserve is based on La. R.S. 9:2800.57(C) which reads:

> A manufacturer of a product who, *after* the product has left its control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

La. R.S. 9:2800.57(C) (emphasis added).

Flowserve contends that "[a]s a matter of law, [9:2800.57(C)] has no application in this case" because, argues Flowserve, Flowserve's predecessor did not learn of the dangerous characteristic after the valve left its control but, rather, "was already aware of the purportedly dangerous characteristic that may cause damage alleged to exist in the Flowserve plug valve and Flowserve contends that it used reasonable care to provide an adequate warning, which is the scenario contemplated in 9:2800[.57](A)." (Doc. 238-1 at 9.) There are several difficulties with this argument. First, Flowserve offers no record support for it. Second, it's contention certainly

14

seems to be disputed by record evidence. (*See*, particularly, Doc. 258-1 at 14–15, ¶¶ 4.26 – 4.30 and supporting record references.) And, as stated by the Advisory Committee notes to Federal Rule of Evidence 702:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Advisory Committee notes to Federal Rule of Evidence 702

Third, there is at least a dispute as to what "dangerous characteristic" Flowserve is admitting it had knowledge of at the time of the original manufacture of its product since Plaintiff accuses Flowserve of "re-defining" and mischaracterizing what Plaintiff is contending in this regard. It is not up to the Court to resolve such disputes; that is for the jury.

Further, argues Flowserve, even it 2800.57(C) did apply, Sawyer does not opine that Flowserve became aware of a dangerous characteristic of the product after it left Flowserve's control or failed to provide an adequate warning concerning same but only that Flowserve changed the design and failed to alert Exxon/Mobil "about its new (allegedly 'safer') design." (Doc. 238-1 at 10.) But this argument is directly belied by paragraphs 4.26 (quoted in full above) and 4.27 of Sawyer's report. (Doc. 258-1 at 14.)

In conclusion, the Court finds that Sawyer's report is relevant to the issues in the case.

### B.  Subsequent Remedial Argument

The second reason advanced by Flowserve to exclude Sawyer's opinions is that the changes to the product upon which opinions are in part based run afoul of Federal Rule of Civil Procedure 407's prohibition against evidence of subsequent remedial measures. (Doc. 238-1 at 10–11 (citing no case law in support of this contention).) This is not a serious argument since, as Plaintiff argues, in order to qualify, the remedial measures must have been taken after the event

causing injury, i.e. the injury itself. (Doc. 258 at 12 (citing Fed. R. Evid. 407, Notes of Advisory Committee on 1997 amendments; *Roberts v. Harnischfeger Corp.*, 901 F.2d 42, 44, n.1 (5th Cir. 1989); and *Arceneaux v. Texaco, Inc.*, 623 F.2d 924, 928 (5th Cir. 1980).) Here, all parties agree that the so-called subsequent remedial measures occurred before Plaintiff's accident and injury. In its reply memorandum, Flowserve fails to address Plaintiff's argument, apparently conceding that its objection is not viable.

### C. Assisting the Trier of Fact

Third, Flowserve argues that Sawyer's opinions are "admittedly not opinions for which any scientific, technical or other specialized training are required to help the trier of fact in this case understand the evidence or determine a fact in issue as required by Rule 702 of the Federal Rules of Evidence. (Doc. 238-1 at 11–12 (citing Sawyer's deposition, Doc. 238-2 at 7–10, 14–14).) This, too, is not a serious argument. Sawyer's report is replete with information and data requiring scientific, technical and specialized training.

### D. Sawyer's Qualifications

Flowserve's final challenge argues that Sawyer is "admittedly not qualified . . . to provide any opinions in this case regarding any of plaintiff's claims against Flowserve under the LPLA." (*Id*. at 12 (citing Sawyer's deposition, Doc. 238 at 36–37).) Federal Rule of Evidence 702 requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony and then leave to the jury the extent of those qualifications. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded by statute on other grounds*. Furthermore, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Carlson*, 822

F.3d at 199 (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).) The Supreme Court in *Kumho Tire*, 526 U.S. at 148-149, 156, and *Daubert*, 509 U.S. at 592, endorsed expert testimony based on personal observation and experience.[4]

    Flowserve argues that Sawyer is a process safety engineer and, as such, is not qualified to give the information and opinions stated in his report.  But it is not uncommon for multiple disciplines to have overlapping areas of expertise. And, as long as the expert is sufficiently trained, educated or knowledgeable about a given subject matter, he may opine in that area even if other disciplines also exercise expertise on the matter. So, for instance, "[a] medical degree is not a prerequisite for expert testimony relating to medicine . . .  [W]e have held that scientists with PhDs were qualified to testify about fields of medicine ancillary to their field of research." *Carlson,* 822 F.3d at 200 (5th Cir. 2016). *See also, St. Martin v. Mobil Offshore & Expl. & Producing, U.S.*, 224 F.3d 402, 405–06, (5th Cir. 2000) (witness' expertise in marshland ecology along with personal observation of property in question sufficiently qualified him as an expert on servitude owner's damage to marshland, even though not trained as a hydrologist). "In a products liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) (collecting cases).

    Furthermore, courts have rejected the notion that the Federal Rules of Evidence require an expert to have previously opined on a specific issue to be "qualified" as an expert on that issue. *See, e.g., BP Expl. & Prod., Inc. v. Callidus Techs, L.L.C.*, 02-2318, 2003 WL 26118097,

---

[4] *See also, LeBlanc v. Chevron USA, Inc*., 396 F. App'x. 94, 100 (5th Cir. 2010) (per curiam) (unpublished).

at *1–2 (E.D. La. Apr. 8, 2003). The Court has carefully reviewed Sawyer's curriculum vitae and finds him well qualified to give expert opinion testimony on the matters set out in his report.

## VI.  CONCLUSION

For the foregoing reasons, the Court finds that Flowserves's motion is without merit and same is **DENIED**.

Signed in Baton Rouge, Louisiana, on September 4, 2020.

 

_____
**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**